The final case on the call this morning, Agenda No. 8, is Case No. 120763, People ex rel. Attorney General v. Wildermuth. Mr. Reagan, ready? Thank you, Your Honor. May it please the Court, my name is Mike Reagan, and together with Rob Brown, who is seated at the Council table this morning, I represent all the defendants, including Matt Wildermuth and George Blanthus. This case presents the task of interpreting provisions of the Illinois Human Rights Act. There are no relevant Illinois cases. It is recognized that the Illinois statute is similar to the analogous provisions of the Federal Fair Housing Act. The attorneys and the circuit of the appellate courts below, as well as the defendants, recognize the utility of looking to Federal court interpretations of the Fair Housing Act as a useful aid in interpreting this Illinois statute. Courts in other states have done the same thing in terms of looking at their state statutes. Two sections of the Illinois Human Rights Act are involved. Section 3-102 contains the definition of the prohibited activity and the description of those persons who are subject to the statute's operation. 3-101 contains the definition, and most prominently for our purposes, the definition of real estate transaction. Two sections of the Federal Fair Housing Act provide the analogous guidance. Section 3604 pertains to discrimination in the sale or rental of housing. Section 3605 pertains to discrimination in residential real estate related transactions, which are defined within that section, 3605. An abundant body of Federal cases have established the principle that those two sections apply to separate stages of housing transactions. Before discussing what is at issue in this case, I think I can serve the court usefully by stating what is not at issue today. Reverse redlining as a general concept is not at issue. That concept can apply not only to the Human Rights Act and the Fair Housing Act, but to other discrimination statutes as well. It has been played by the Attorney General. But whether there is reverse redlining or not does not begin to answer the question as to whether today's defendants are persons defined to be liable under the Fair Housing Act. The role or impact of the targeting by advertising theory is also not at issue today. The Attorney General has pled that as well. The Attorney General has not pled any acts of overt discrimination, and the defendants vigorously deny that they overtly discriminated or treated any client differently because of race, ethnicity, or any prohibitive category. But defendants have not made an issue in this appeal that those targeting by advertising allegations might not serve as a substitute for allegations of overt acts of discrimination. But defendants do note, parenthetically I might add here, that as is stated in depth in the amicus brief supporting the Attorney General, that ever since, and I'm quoting, ever since subprime mortgages became widely available in the mid-1990s, communities of color have held a disproportionate percentage of those loans. And that, by definition, sort of forms the client base to be served here. Mr. Reagan, is it your position that redlining is not at issue because your position is that defendants didn't engage in real estate transactions and weren't brokers, and we don't get to redlining in that case? Almost. So I'm saying that the second part is correct. And, in fact, really the entirety of your question is correct, but I'd like to just kind of rephrase the logic. If there was no redlining, and redlining, part of redlining is an allegation of predatory or discriminatory practices. So if there wasn't that, we wouldn't have a case. So what we're saying is to make the court's job easier is that it's pled, but that the defendants cannot be held liable under the statute because they did not engage in a real estate-related transaction. So reverse redlining applies to things other than real estate transactions. It applies to different types of discriminatory activities and not just the Fair Housing Act. So we're saying for purposes of analysis, for argument here, it can apply, but the hard nut core of our argument here today is that these attorneys and the support staff did not engage in real estate-related transactions. So I would agree with everything you said. That's the way I get to it. Every client borrower retained here, involved here, to provide legal services. This is a practice with a lot of clients, and it's highly document-intensive. Every client arrives at the office with many documents, most of which are highly biased by design against the client. And dealing with the lenders is in part a difficult bureaucratic process because you're continually put off by people with the lenders, by lower-level people, and so you need support staff to help with that, and much follow-up is required. This is a Supreme Court Rule 308 appeal. While the question to be certified proposed by the defendants is in the appendix at A250, the circuit court wrote the question that was certified. It was slightly different. And the question, of course, well-known to the court, is whether the state may claim a violation pursuant to reverse redlining theory where it did not allege that defendants acted as a mortgage lender. We recognize that when the court gets down to writing its opinion here and to closely analyzing the matter, that the wording of the question presents the potential for difficulty. And while it is the central thesis of our position, as I just discussed with Justice Thomas, that after the homeowner acquires the residence or the initial funding, the 36 of 4 comes in, the initial acquisition of the housing, that the Human Rights Act and the Fair Housing Act apply only to those who by being in the pipeline of the funding have provided money or financial assistance to the borrower. It is possible, and we're saying it is possible, even in the defendant's view, that an entity other than a, quote, mortgage lender, which is the phrase in the 308 certified question, could be liable. So as a result, the question as posed could perhaps be answered in the affirmative for both the plaintiff and the defendants. But in one view, in some view this court might take, that would not answer the more central issue as to whether the Fair Housing Act is properly interpreted to extend so far as to apply to this defendant lawyer and his staff when they are working for the borrower and not for the lender. In Bright v. Dickey, this court recognized that the certified question was, in the words of the court, flawed. This court then changed the wording of the question and answered that reformulated question. There the court also said that in the interest of judicial economy and the need to reach an equitable result, this court could consider the propriety of the order, which gave rise to the appeal. This court did that in Bright, and they also did it in Vision Point of Sale v. Haas in 2007. Other cases more recently than that recognize the principle that this court has the power to go beyond the question to reach the propriety of the order, which gave rise to the certified question. So we ask that the court answer this, a number of alternatives for the court, that the court answer the certified question in the negative, but most likely implied by exclamation. Or secondly, that the court then go on to rule upon the order denying our motion to dismiss, which the attorney general has offered as an option as well, not to deny it, of course, but rather to rule upon it, and reverse the denial of the motion to dismiss. Or alternatively, that the question be rephrased, much as defendants offered below. The pertinent operative language of the Illinois Human Rights Act is in Section 3-102B. It is a civil rights violation for an owner or any other person engaging in a real estate transaction, and that's what this case is all about, because of unlawful discrimination to, and then alter the terms, conditional privileges of real estate transaction or in the furnishing of facilities or servicing connection therewith. So for a person to be liable under the Illinois Human Rights Act, he must have engaged in a real estate transaction. And a real estate transaction is defined in Section 3-101B. Real estate transaction includes the sale, exchange, rental, or lease of real property, period. Real estate transaction also includes the brokering or appraising of residential real property and the making or purchasing of loans or providing other financial assistance. And it is at this point where all the parties have looked to the Federal Fair Housing Act. The opinions recognize that 3604 and 3605 should be interpreted to govern different spheres of activity, because otherwise they would be duplicative and therefore superfluous. There is no doubt that 3604 is held by the vast majority of cases pertaining only to the acquisition of housing in the first instance, either by sale or rental. Some circuit authority on that, which we've cited. 3605 is held by the weight of federal authority to apply only to those parties who served as the lender, broker, or appraiser of the loan at issue, or otherwise provided financial assistance to the borrower. We've cited a number of cases on that. Jones, Davis v. Wells Fargo, Moore v. FDIC. The plaintiff is offered, and I say with respect, no compelling authority for the proposition, that 3604 provides any competent analogy to the facts of this case. So 3604 does not exist before here. At page 29 of our brief, we have combined the texts of both section 3-101B of the Human Rights Act, defining real estate transaction, and section 3605 of the Fair Housing Act, defining essentially the same thing, residential real estate related transaction, to show very graphically how they are essentially the same. And it is that congruence between the statutes and their common purpose which makes it legitimate to give weight to the body of federal case law under 3605 in construing the Illinois Human Rights Act. The defendants here, my clients, have not engaged in the sale, exchange, rental, or lease of real property, or brokered or appraised it, or made or purchased the loans. The section 3-101B goes on to require that all those activities be for the purpose of, quote, So all that is left to examine here is whether the defendants can be legitimately said to have rendered, quote, financial assistance, end quote, as that phrase is used in that same single sentence in which all those other activities which we did not engage in are described. So what the defendant attorney and his support staff did bears no resemblance to any of those other aspects of the definition of a real estate transaction, especially when the other purpose of the statute, when the purpose of the statute is considered in conjunction with federal case law. Davis v. Wells Fargo says that 3605 applies only to transactions involving the making or purchasing of loans. Davis v. Fenton says the courts in this district, referring to Illinois, hold that 3605 applies only to transactions involving defendants that are lenders, brokers, or appraisers of mortgage loans. The defendants performed no actions on behalf of any lender or servicer. They did not provide any funding or money to the client borrower. To the contrary, the defendants are always opposed to the lenders. The lenders or their agents make decisions on the new loan details the defendants do. The defendants advocate for the borrowers and against the lenders. Mr. Brigham, may I stop you there? Specifically, can you tell us what are the allegations in the complaint as to the conduct of the defendants? What is alleged that they did? Since we're talking about verbs here, what is it alleged that they did? And what the complaint says. They basically said they didn't do a very good job for their clients. I mean, that's basically what it boils down to, that they signed agreements with clients and received retainers' fees. To do what? The defendants represent distressed borrowers who are in trouble on their mortgages in some way or other. And so the defendants then come in to try to work it out as best they can with the borrowers. And the attorney general says, well, you didn't do a good job. They say you did a dishonest job, that you took money. But again, what is the conduct? What did they do? And we're concerned about what they did, their conduct fits into any of these definitions. You said they did only legal advice. I'm not sure where that fits in. What did they do? What are the allegations? Did they prepare documents? Did they attend mediation sessions? What specifically is alleged that they did? The state alleges that in some of the cases, they agreed to represent clients who the defendants should have known could not be helped. But nonetheless, they agreed to take their money and say, we're going to represent you, even though, for instance, a client might have already obtained all the relief that it could get under one of the federal statutes. It's that sort of activity. And the complaints is detailed. But basically, that they didn't do, that the defendants did not do an appropriate job attempting to work out things with the borrowers, with the lenders, rather, and that they represented clients that they should have recognized from the outset could not benefit from their representation. So all that stands here is the conclusion of the appellate court that the defendants, and it is phrased as a conclusion, provided other financial assistance for maintaining a dwelling. But that ignores the interpretive aid where you, in determining what financial assistance means, that you look at the other parts of the same sentence to see what those activities look like. And what the defendants did bears nothing, that is, what the defendants did in representing borrowers here, adverse to lenders. There is nothing in common with the remaining parts of 3-101B, brokering or appraising or the making or purchasing of loans. Moore v. FDIC, which is cited in Davis v. Fenton and Davis v. Wells Fargo, in dismissing 36 of 5, which is basically what this is, said that the allegations all involve post-default action. So there is no logical end to the reach of 3-102 if this court were to condone the appellate court's interpretation here of, quote, providing other financial assistance for maintaining a dwelling. In our brief, we offered the hypothetical. It is extreme, but it is nonetheless real, that a credit card issuer extends credit to somebody and then goes to a big box store and buys things to work on their house. And that, under the appellate court's interpretation, would be rendering financial assistance. Is there any case law, or I guess you should say, does the statute define maintaining? It does not, Your Honor. And is there any case law that defines maintaining? There is none that I am aware of as I stand here. So do we know whether it means like physical maintenance of the property or whether it means maintaining possession of the property? I don't know of any case that would help the court to answer that question. In preparing for this argument, I reread NAACP v. American Family, which is a case cited by the appellate court. And although I might not often, in justice, Judge Easterbrook wrote something that really resonated with me, even though it draws a math analogy for which I apologize to some of you. And he wrote that one can always do more in pursuit of a goal, but statutes have limits. You cannot discover how far a statute goes, how far a statute goes, by observing the direction in which it points. Finding the meaning of a statute is more like calculating a vector with direction and length than it is like identifying which way the underlying values for purposes point. So even though it is clear what the general purpose of the Fair Housing Act is, nonetheless, the question here is, are these defendants subject to the operation of the statute? And I earnestly suggest that they are not, because they, as attorneys and support staff, do not engage in a real estate transaction. There's no need to stretch the statute beyond its logical scope. There are three other counts pending against these defendants, under the Mortgage Rescue Fraud Act, under the Illinois Consumer Fraud Act, and the FTC's Mortgage Assistance Relief Services Rule, and those are being actively litigated as we stand here. And so there's no stated reason why the attempt to contort this statute, the Fair Housing Act, excuse me, the Human Rights Act, is why the attempt to contort this statute is anything more than just prosecutorial piling on. A ruling for the defendants here, the statute does not apply, would negate the troublesome aspect, which we have also briefed, which I'm not going to argue this morning, the relationship between this Court's regulation of attorneys and in the practice of law and the operation of the statute. Who has further questions? Thank you. Thank you, Mr. Schmidt. Thank you, Mr. Chief Justice, and may it please the Court. My name is John Schmidt. I'm an assistant attorney general, and I represent the people of the state of Illinois who ask for affirmance of the appellate court. I'm going to start with Mr. Reagan's last point. We had a very good reason for bringing Count 4. It is not an example of piling on by any means. Down below, Mr. Wildermuth has vigorously opposed the other three counts on the basis that they cannot apply because he was engaged in providing legal services. Two of them involve a statute or a regulation that does provide such an exemption for an attorney providing legal services. And the consumer fraud count, they are raising a similar argument. The statute does not explicitly accept legal services, but this Court has ruled in Bright v. Leiter that it does not apply to legal services. That is one reason we brought Count 4. Again, it is not piling on, and it is also brought because we believe that this type of targeting of African Americans and Hispanics for predatory services and taking advantage of them does constitute unlawful discrimination, which is addressed by the Human Rights Act. And Justice Price, you asked what the allegations are, and I would like to go into that now. Basically, and we allege this very specifically, our allegations were that what Mr. Wildermuth's firm and LMN would do, again, they targeted advertising radio ads on radio stations that had almost exclusive Hispanic and or African American listenerships. So they were targeting these groups for their services. People would call them, come into their offices, and according to our complaint, they would be told, we can get you a specific mortgage reduction in a specific amount within a specific time. And sometimes that would not be the case. Although they did sign attorney-client agreements, which gave very broad authority to Mr. Wildermuth to do things like negotiate short sales if necessary, to represent the individuals in foreclosure proceedings if necessary, to pursue loan modifications. What the services really amounted to was taking information from these individuals that was relevant in applying for what are called HEMT loans, the Home Affordable Mortgage Program, which is a federal program. And we allege with regard to three individuals very specifically that they took money from these individuals, substantial sums, and took information, applied to HEMT on their behalf, even though they did not meet basic eligibility requirements. So what they did was they took information from clients, legal services clients, attorney-client relationship. Took information, they prepared documents, and what else did they do? They then submitted those documents and the HEMT loans were rejected because they did not meet fundamental criteria. So they gathered information, prepared documents, and submitted documents. That's the conduct that we're looking at to determine if, in fact, these larger terms, real estate transaction, broker, financial assistance, et cetera, how those apply. But we're looking at the conduct as taking information, preparing forms, and submitting those forms. Is that correct? Yes. And holding themselves out as doing something more, as potentially doing more than that, also holding themselves out or also representing to these people, we are going to get you financial help. We are going to get you specific mortgage reductions in specific amounts. They were a whole end. Mr. Schmidt, before you go on, in just listening to Justice Tice's question, and I know you agree with the response given by the appellate court, do we necessarily and do you necessarily agree with the analysis that the defendants, at least arguably, were not necessary conduits for the loans, were they? People could have, and in one case, an individual did apply herself and actually get the loan, but for some reason they took money from her, too. So not necessarily. Not necessarily conduits. And they didn't provide financial assistance in the sense conveyed by the statute, did they, when charging for their financial advice and legal services? We think they were providing financial assistance. Providing means, one definition of providing is to make available. They were telling these consumers, we are going to get these loan modifications for you. So, in effect, we are going to make financial assistance available to you. If we find the appellate court's analysis faulty, is there a way that you'd be arguing or that this court could look at and still come up with the same answer to the certified question? Yes, I think so, Your Honor. I think they can also be held liable because they would fit within the definition of a real estate broker or salesman in Section 3101D, and that's a broad definition. It does not have to be a licensed individual, and it's somebody who lists, sells, purchases, exchanges, leases or rents, rents or leases real property, or who negotiates or attempts to negotiate any of these activities or, crucially, holds himself or herself out as engaged in them. And Mr. Wildermuth had his customers sign agreements authorizing him to negotiate short sales on their behalf. So we think that would fit in within the definition. Does it explain, does your complaint explain what those terms in the agreement means? Negotiate short sales with whom? Negotiate with whom? It does not. Back again, we're trying to decide the term of broker. What does that mean? And so we're looking at verbs. So when it says negotiate short sale, is that negotiating, again, with the bank for their agreement to real estate sale? What does it mean? It doesn't really say. It does have a copy of a power of attorney attached to it that at least one consumer signed. That doesn't say it, but the power of attorney does seem to give very broad authority to Mr. Wildermuth. And, you know, this is at the pleading stage, so the pleading has to be construed in favor of the pleader. And I would also point out, too, this is a remedial act, and this court and the appellate court have said it is to be given a broad construction to advance its purposes. And in this context, as our amicus brief indicates, one of those purposes is to protect people against discrimination in housing and in real estate transactions. And we have alleged that these individuals, distressed homeowners, were facing discriminatory activities that cost them several thousands of dollars, again, while they were distressed homeowners, threatening the possibility of taking them out of their homes. And we think this is the kind of conduct that the act was certainly intended to reach. Does the act require that it be part of a scheme? I don't think it requires that it be part of a scheme, Your Honor. So even if they did one that didn't work out, would they be subject to the act then? Well, it would be, I think, as a practical matter, much more difficult to subject them to the act. One reason we're saying they're subject to the act here is that it was done more than once, and also that it was specifically targeted at members of two groups. So I think one isolated situation would be pretty hard to prove. But according to our complaint, this is not an isolated situation. So it isn't the case of a lawyer takes a case or two that don't work out, and then they're subject to a violation of the Human Rights Act? No, I don't think so, Your Honor. And, you know, again, we had 90 complainants in these people who complained to our office in these cases, and this is alleged in our complaint. We knew the racial or ethnic groups of 81 of those. 80 were either African American or Hispanic. So this is not, these are not isolated cases that don't work out. And I would also point out, we hear a lot, you know, the defendants talk a lot about the legal services they're providing, but this is a situation where individuals are not meeting basic HAMP criteria. In one case, was not even in default and had other criteria she didn't meet. In another case, the person's lender didn't even participate in HAMP. And then there was Ms. Ramirez, who had already gotten the HAMP loan. They took money to, you know, I don't know why. So this goes beyond cases against lawyers. Mr. Schmidt, Mr. Reagan makes a separation of powers argument, too, saying that, you know, lawyers aren't allowed to, under the rules, to legally discriminate. Is there a mutual exclusivity in finding that they were a lender and also finding that there was an attorney obligation as well? I mean, what's your position on that? I don't think so. I don't think there is. I don't think those things would be mutually exclusive. I think when Mr. Willingworth is representing that he is an attorney, he assumes the obligations of an attorney, certainly. But this business was a loan modification business, and Mr. Willingworth's partner, Mr. Piantas, is not an attorney, and he has a background with a company called Heartland Mortgage. As we indicated, it's in page 1138 of the record in our fourth amended complaint, and it's a mortgage company that the attorney general ended up filing a couple of complaints about. So we don't think that those things are mutually exclusive, Your Honor. And there's another point I would like to make. Mr. Reagan referred a couple of times to this court interpreting the Fair Housing Act. With due respect to him, you're not doing that. You're interpreting the Illinois Human Rights Act. And certainly the FHA and its cases can be used as guides, but the acts are structured differently, and I would advise the court to pay attention to that. The FHA has separate provisions in Sections 3604 and in Section 3605. And what the Illinois Act does is more or less, not exactly, but close, combine those into 3102B. And then the definitions in Section 3101 of the Act all apply to Section 3102. And an example of where that may make a difference is that the FHA Section 805, but it's 42 U.S.C. 3605, contains the other financial assistance language, but that language is not present in Section 3604, which concerns the sale, leasing, or exchange of real property. Here, though, the other financial assistance language is in Section 3101B, and it would apply to both types of transactions. It would apply to the sale, leasing, or exchange of real property, and it would also apply to what would be a Section 3605 claim under the Federal Act. Mr. Schmidt, help me understand something here. The certified question seems to turn on whether or not the defendants acted as a mortgage lender. You urge, I mean, the trial court and the federal court said, no, that's not necessary. You agree with that. So what hat is it under the Illinois Human Rights Act that the defendants have acted? In what way have they acted to commit violations, if not as a mortgage lender? Your Honor, under Section 3102B, our position is both that they engaged in real estate transactions and acted as real estate brokers or salesmen. I'll take the real estate transaction first because that's what the appellate court found, that they engaged in real estate transactions, and in so doing, under B, they altered terms and conditions of a real estate transaction or in the furnishing of facilities or services. But the reason they engaged in a real estate transaction was that they provided other financial assistance, which is in the definition of a real estate transaction in 3101B. Let me stop you there. When you say provided financial assistance, does that mean, I mean, they didn't provide funds, not from them. No, they did not, but they held themselves out as being essential or important, an important link in providing funds to the consumers. And we have cited case law in our brief, and I'll draw, under the FHA, and I'll draw the court's attention to the EVA case, indicating that you do not necessarily have to provide the funds to be liable. And we also, as I pointed out earlier, say that they were acting as, or they were at least holding themselves out as acting as real estate brokers or salesmen, and that that would also give them potential liability under the Act. And again, I'd emphasize, this is at the pleading stage still, and, you know, and we're just asking for our day in the court on this account. And we think that, you know, these actions, again, I'll remind the court that this is a remedial statute, and this court has said that it should be broadly interpreted to accomplish its objectives. And one of those objectives, of course, is to prevent discrimination in housing and in real estate transactions that operates to potentially deprive potential victims or members of protected groups of housing opportunities. And although this is not an original real estate transaction, we think this sort of scenario can operate to potentially do that, and we ask for approval. Thank you very much, Your Honors. Thank you, Mr. Schmidt. Mr. Reagan. Thank you. In the nature of rebuttals, I'm going to hit some things in quick order here. First of all, Mr. Plantis and Mr. Woodman are not partners, as Mr. Schmidt just said they were. Secondly, I hope it's clear that I'm not asking this court to interpret for operative purposes the Federal Act, but everybody here, including Attorney General, has brought it in by way of analogy. The enduring question that goes on here as to what they did, the example that's brought up is a HAMP, another program the courts have both been with, as one example. But the retention agreement just goes way, way beyond that. And so I'm quoting at page 15 of our reply brief, which is a quote from the attorneys' agreement, the retainer agreement, which is attached to the complaint. It says that the attorney is to pursue many options, including a forbearance agreement, payment moratorium, loan restructure, short sale payoff, deed in lieu of foreclosure transactions, submitting pleadings in opposition to the foreclosure complaint, extending deadlines in the foreclosure process, and it goes on and on and on. So there is a big content of legal services here and not just both filling out forms or something like that. And, of course, I'm aware of the quagmire we don't want to step into here about Stone Street Park. So that's that. The structure of the different structure of the act does not matter because in both the Illinois Act, which is all that matters, it says that you are liable for a person who engages in a real estate transaction. And that's where the analysis stops because that didn't take place here. And so, you know, how the act is combined after that simply doesn't make any difference. They talk in their brief about facilities and services as being in a different place. However, you don't get to read about facilities and services unless you're talking about a person who has engaged in a real estate transaction. Lastly, I would suggest a question from Justice Thomas. Is there a way to affirm the holding of the appellate court on a different ground? And the option that was offered to you was to say that my client attorneys and the support staff were real estate brokers. And I suggest that this court could not possibly write that opinion and have it make any sense. And I'm sure it would therefore not be heard. I thank you. Thank you. Case number 120763 will be taken under advisement as agenda number eight. Mr. Reagan and Mr. Schmidt, thank you for your arguments this morning. Marshal, the Illinois Supreme Court stands adjourned until tomorrow morning at 9 a.m.